IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| EVANGELINA DENISE HEWITT, | ) | CIVIL ACTION NO. 9:14-3790-MGL-BM |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner wherein she was denied disability benefits.

This case was referred to the undersigned for a report and recommendation pursuant to Local Civil

Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) on July 15, 2011 (protective

filing date), alleging disability beginning February 24, 2011, due to high blood pressure, arthritis,

diabetes, anxiety, back problems, depression, knee problems, carpal tunnel syndrome, allergies,

asthma, and a learning disability. (R.pp. 15, 186, 217). Plaintiff's claim was denied both initially

and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge

(ALJ), which was held on June 25, 2013. (R.pp. 31-48). The ALJ thereafter denied Plaintiff's claim

in a decision issued July 26, 2013 (R.pp. 15-25). The Appeals Council denied Plaintiff's request for

a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the

Commissioner. (R.pp. 1-5).



Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)).

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).



**Discussion**

A review of the record shows that Plaintiff, who was forty-five old on the date she alleges she became disabled and forty-seven at the time of the ALJ's decision, has a high school education and past relevant work experience as a certified nursing assistant. (R.pp. 23, 35-36, 186). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months. After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[1] of obesity, degenerative disc disease, degenerative joint disease of her right knee, parasthesias/neuropathies, depression, and anxiety (R.p. 17), she nevertheless retained the residual functional capacity (RFC) to perform sedentary work[2] with the limitations of frequently performing fine/gross manipulation and the use of a cane for ambulation. The ALJ further limited Plaintiff to the performance of simple, routine, repetitive tasks with only occasional interaction with the general public. (R.p. 20). While the ALJ found that these limitations rendered Plaintiff unable to perform any of her past relevant work, (R.p. 23), the ALJ obtained testimony from a vocational expert ("VE") and found at step five

---

[1]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[2]Sedentary work is defined as lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).



that Plaintiff could perform other jobs existing in significant numbers in the national economy and therefore was not disabled during the period at issue. (R.pp. 23-24).

Plaintiff asserts that in reaching this decision, the ALJ erred because she failed to properly evaluate Plaintiff's impairments in combination and because the ALJ's RFC finding was legally and factually insufficient. However, after a careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d at 642 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

### Medical Record

A review of Plaintiff's medical records show that she sought treatment for back pain beginning in 2009. (R.p. 283). During 2010, Plaintiff was also treated for poorly controlled diabetes, hypertension, bronchitis, and Bell's palsy. It was noted on several occasions in these records that Plaintiff had a history of non-compliance with appointments and medications. (R.pp. 284-291). In any event, Plaintiff does not contend that any of her impairments were of a disabling severity during this time.

On April 21, 2011 (approximately two months after her alleged onset date), Plaintiff began treatment at the Barrier Island Free Medical Clinic (Barrier Island Clinic), where she reported that she suffered from diabetes (which had been diagnosed when she was in her 30s), gastroesophageal reflux disease (GERD), and chronic allergies, and that she was running low on her medications. The impression was that Plaintiff was suffering from weight-related illnesses, and the plan was for her to restart her medications. (R.pp. 308). On April 25, 2011, Plaintiff was treated at

4



Bon Secours St. Francis Hospital after she accidentally overdosed on insulin. Plaintiff's diagnoses at that time included diabetes, anxiety, elevated blood pressure, and hypertension and depression by history. (R.pp. 309-314).

On September 6, 2011, Plaintiff was treated in the emergency room at the Medical University of South Carolina (MUSC) for complaints of nausea and an episode of vomiting and pain/tingling in her right leg. She was found on examination to have full strength in all of her extremities and her cranial nerves were grossly intact. The impression was dizziness, not otherwise specified. (R.pp. 346-347). On September 8, 2011, an MRI as well as a CT scan at MUSC of Plaintiff's brain showed no evidence of an acute intracranial abnormality. (R.pp. 355-356).

On October 15, 2011, Plaintiff was treated at the St. Francis/Bon Secours emergency room for an episode of sciatica. Plaintiff had painless range of motion of her back, full range of motion of her extremities, and had normal reflexes, sensation, and motor strength. A head CT scan was unremarkable with no evidence of intracranial bleeding or acute infarct. A lumbar spine MRI was normal without evidence of focal lesion or disc bulge, and Plaintiff's spinal cord and cauda equine were within normal limits. Toradol was administered and Plaintiff was released home with prescriptions for Percocet and Prednisone. (R.pp. 325-330). Plaintiff was then seen at the MUSC emergency room the following day, at which time she reported an increase in pain and difficulty walking. She had an ataxic gait, needed assistance to stand without falling, and had tenderness to palpation in the paraspinal areas. However, on testing Plaintiff's straight leg raise, cranial nerves, motor strength in all extremities, and sensation were all normal. Plaintiff was diagnosed with ataxia and released with instructions to follow up with a neurologist. (R.pp. 344-345)



At a follow up appointment at Barrier Island Clinic on October 17, 2011, Plaintiff complained of pain in her lower back which radiated to her left leg. She stated she had been fired from her last job for "walking problems." Examination revealed tenderness in Plaintiff's lower lumbar spine without paraspinal spasm, 5/5 (full) motor strength in her lower extremities, 2-3+ reflexes, and sensation intact to light touch. Plaintiff was referred to a neurologist for further evaluation. (R.pp. 391-392). At Barrier Island Clinic on October 20, 2011, Plaintiff reported back spasms, anxiety, difficulty with concentration, and trouble sleeping. She described anxiety spells, difficulty with concentration, and a history of depression over the years which had recently returned when she lost her job. The impression was diabetes (not at goal), anxiety, depression, and recent overuse of Oxycodone. Plaintiff's walking had improved and it was also noted that she exhibited a normal gait when distracted. Plaintiff was also found to have normal sensation in her upper and lower extremities, and she was able to balance normally on one foot on either side. Improvement since discontinuing Oxycodone was noted. Plaintiff was referred to the Charleston Mental Health Center (CMHC) and signed up for a prescription assistance program. (R.pp. 389-390).

Plaintiff reported feeling depressed at a psychiatric evaluation by Dr. Boyd at Barrier Island Clinic on November 22, 2011. She related a five-year history of depressive symptoms for which she had been prescribed Lexapro and later Celexa. Examination findings were that her judgment was poor and she displayed an odd motion of patting her head, but her thought process was linear, and she was pleasant and cooperative. Plaintiff was assigned a GAF score of 70.[3] Dr. Boyd

---

[3]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 597 n.1 (9th Cir. 1999). A GAF score between 61 to 70 reflects the presence of only "mild symptoms" or "some difficulty in social, occupational, or school functioning." Am. Psychiatric
(continued...)



opined that Plaintiff's depression was not under control, and it was suggested that Wellbutrin be added. (R.pp. 385-387).

Plaintiff thereafter underwent a consultative examination performed by Dr. Jennifer Bennice, a psychologist, on November 30, 2011. Plaintiff told Dr. Bennice that her depression worsened after she lost her job, and she described worrying more than half of every day, irritability, fatigue, and nausea. With respect to activities, Plaintiff reported that she had ongoing contact with her children and grandchildren, she shared cooking and grocery shopping responsibilities with her husband, and she was able to drive herself. Examination revealed that Plaintiff was alert and cooperative, she maintained appropriate eye contact, her speech was within normal limits, her thought processes were linear, concentration and memory were moderately impaired, her affect was full-range and congruent, mood (as reported by Plaintiff) was "crappy," insight seemed limited, and judgment was fair. Dr. Bennice thought that Plaintiff exhibited symptoms of depression and anxiety which would be helped by treatment from a psychiatrist and a cognitive-behavioral therapist, but opined that Plaintiff, who reportedly was helped with her financial management by her son, would likely to be unable to independently manage any benefit payment awarded. (R.pp. 357-359).

Records reflect that Plaintiff was treated at Barrier Island Clinic for lower back pain on December 5, 2011. Straight leg raise testing was positive, but better than expected. Meloxican was prescribed. (R.p. 384).

The following day, December 6, 2011, Plaintiff underwent a comprehensive orthopedic examination performed by Dr. Kerri Kolehma. X-rays of Plaintiff's right knee showed

---

[3](...continued)
Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000). Notably, Plaintiff was also at the very top of this GAF range.



mild osteoarthritic changes and a possible osteophyte or loose body in the central joint space, while lumbar spine x-rays indicated mild caudal facet arthropathy. (R.pp. 368-369). Plaintiff complained to Dr. Kolehma of constant low back pain aggravated by walking and bending, knee pain that was worse on the right, a joint which would occasionally catch, carpal tunnel syndrome (CTS) symptoms in both hands (right worse than left), and intermittent numbness in her hands that she had to "shake" out. She also stated she was fired from her last job of eight years for missing too much work. On examination Plaintiff's gait was normal except when asked to walk, at which time she displayed forward and backward swaying motion which Dr. Kolehma stated was not physiological. Plaintiff's lumbar spine motion was restricted by pain and she stopped squatting secondary to knee pain, although her knees showed no crepitus, swelling, or erythema. She had range of motion in her hand that was within functional limits, no tenderness over her palms, and Tinel's and Phalen's tests were negative. Dr. Kolehma noted that Plaintiff was extremely obese and thought that weight loss would help with her complaints. Dr. Kolehma opined that Plaintiff was able to perform fine and gross movements with her upper extremities; was able to ambulate without assistance; and was independent in her activities of daily living; although she should avoid squatting, lifting, and bending as these would aggravate her pains. (R.pp. 364-367).

On December 13, 2011, Plaintiff complained to Dr. Boyd at Barrier Island Clinic about continued depression. Dr. Boyd noted that Plaintiff was alert and neatly dressed with a slightly restricted affect, rated Plaintiff's GAF score at 75,[4] and adjusted her medications. (R.p. 383).

---

[4]A GAF score between 71 and 80 indicates that if symptoms are present, they are transient and expectable reactions to psychological stressors, and result in no more than a slight impairment in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorder (DSM-IV), 32 (4th ed. 2000).



On December 31, 2011, Plaintiff reported not feeling like herself. Her husband reported that Plaintiff stated "take me home" when she was already at home and sometimes spoke to someone who was not there. Wellbutrin was added to Plaintiff's medication regimen and she was asked to record any odd conversations at home. Plaintiff was assessed with major depressive disorder (MDD), possibly with psychotic features, although her GAF remained at 75. (R.p. 383).

In January 2012, state agency physician Dr. George T. Keller, III reviewed Plaintiff's medical records and opined that Plaintiff had the physical RFC to perform a limited range of sedentary to light work[5] (he opined that she could occasionally lift and/or carry up to twenty pounds and could stand and/or walk up to four hours in an eight-hour workday). (R.pp. 58-60). As for any mental impairment, state agency psychologist Dr. Michael Neboschick opined that Plaintiff was able to understand and remember simple instructions, sustain attention for simple, structured tasks for periods of two-hours segments, adapt to changes, make simple work-related decisions, maintain appropriate appearance and hygiene, recognize and appropriately respond to hazards, work in the presence of others, and accept supervision. (R.p. 61).

On January 4, 2012, Dr. Boyd again adjusted Plaintiff's medications, noted that she was having episodes of anxiety, and assessed her with a GAF at 60.[6] Plaintiff complained at Barrier Island Clinic of panic attacks on January 10, 2012. She had written down that she experience two

---

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2005).

[6]A GAF score of 51 to 60 indicates "moderate symptoms" or "moderate difficulty in social or occupational functioning".



outbursts, one during a family gathering and another when she was accused of shoplifting (she stated she had left an item at the bottom of the cart and walked out of the store, but no charges were filed). It was noted that she continued to display a tic of patting her head. (R.p. 382).

On January 24, 2012, Plaintiff was treated for back pain, which she described as worse when she was laying supine. It was noted that she had had a normal lumbar spine MRI on October 15, 2011, and weight loss and conservative treatment with non-steroidal anti-inflammatory medication was recommended. (R.p. 380). The next day, Plaintiff reported to Dr. Boyd that she had episodes of confusion, especially when she was having difficulty sleeping. She also reported that although she sometimes enjoyed going out once she left her house, she most often preferred to isolate herself in her room. Dr. Boyd's impression was MDD with psychotic symptoms, he assessed Plaintiff with a GAF of 60, and encouraged her to continue taking her medications and to get out more. (R.p. 378).

Plaintiff was treated for anxiety and chest pain at MUSC on February 2, 2012. She reported racing thoughts and nausea which started two nights prior to the visit when she was pulled over by the police for a broken license plate bulb and there was an outstanding warrant for her for not having the children in the car in car seats. (R.pp. 370-371). At Barrier Island Clinic on February 7, 2012, Plaintiff reported she had had a bad week including her hospital visit a few days prior, and complained of low back pain which radiated into her thighs. Plaintiff was noted to have difficulty walking, and she displayed repetitive hand and arm movements. Her GAF was assessed at 55. (R.p. 377).

On March 6, 2012, Plaintiff reported she was experiencing symptoms of depression, she slept poorly and could not cook because of back pain, and had continued to say to her husband



"Let's go home" even though they were already there. Her GAF was assessed at 55, and it was recommended that she use a cane or walker so that she could get more exercise. (R.p. 375).

Plaintiff was also referred back to CMHC, where her anxiety and depression were assessed on March 20, 2012.[7] Plaintiff reported that she had been treated at Barrier Island Clinic for difficulty walking and shaking, which she had been told were anxiety symptoms, as well as that she suffered from tremors and tingling in her limbs (which occurred even at night and sometimes woke her up) and episodes of confusions. She also stated that everything she was experiencing made her feel ashamed and more depressed, that she had been sleeping excessively in order not to feel anything, that she would call out for husband even when he was not at home, and that sometimes she would state that she wanted to go home when she was already there. Plaintiff endorsed symptoms of insomnia, decreased appetite, decreased energy, and decreased libido, and she was diagnosed with MDD (recurrent, moderate) with a current GAF of 56. (R.pp. 461-465).

In April 2012, state agency physician Dr. Isabella McCall opined that Plaintiff could perform a limited range of sedentary to light work (she opined that Plaintiff could occasionally lift and/or carry up to twenty pounds and could stand and/or walk for four hours in an eight-hour workday), limited to frequent handling/fingering with the right hand (due to Plaintiff's allegations of CTS/numbness in her hands). (R.pp. 74-76). State agency psychologist Dr. Camilla Tezza opined that Plaintiff had the ability to understand and remember simple instructions and procedures, to sustain reasonable attention and effort for simple task completion involving minimal variation, and to complete unskilled work with limited public interaction. (R.pp. 77-78).

---

[7]The note is dated April 5, 2012, but indicates that the initial assessment was begun on March 20, 2012. (R.p. 461).

11



At CMHC on April 10, 2012, Plaintiff reported improvement on her medications, stating they helped with her depression, sleep, and back pain. Her GAF was assessed as 64. (R.pp. 477-478). A brain MRI showed no evidence of acute intracranial abnormality on May 24, 2012. (R.p. 432).

In a report of progress dated June 11, 2012, a provider at CMHC reported that Plaintiff had achieved some progress and demonstrated more understanding of her anxiety and options for managing it. Her GAF score was back up to 70 at that time. (R.p. 468). At CMHC on July 3, 2012, Plaintiff complained about a variety of issues, including feeling nervous, shaking, talking out loud inappropriately, and repeating things. Her GAF was rated as 69. (R.pp. 479-80). On July 31, 2012, Plaintiff told a CMHC provider that she was not feeling like herself and was irritable and snappy. Her GAF was assessed at 60. (R.pp. 481-482).

On September 6, 2012, Plaintiff was treated at MUSC for complaints of anxiety with Zofran and Ativan. (R.pp. 452-456). On September 9, 2012, a clinician at CMHC reported that Plaintiff's progress was uneven over the preceding 90 days, and there was some concern that Plaintiff had not been taking her medications as prescribed. Her GAF score was rated at 60. (R.p. 469). On December 8, 2012, Plaintiff reported stress and anxiety as to situations in her life (such as court dates), with the CMHC progress report indicating that Plaintiff had been arrested twice over the previous 90 days for shoplifting. Her GAF was rated as 55. (R.p. 470).

On January 7, 2013, Plaintiff went to Nason Medical Center Urgent Care with complaints of developing numbness across her body while driving that day. However, on examination her physical and neurological findings were normal, Plaintiff was noted to be alert and oriented, her memory was intact, her cranial nerves were grossly intact, sensation was normal, she



had no motor weakness, her gait and balance were intact, her coordination was intact, her fine motor skills were normal, her deep tendon reflexes were preserved and symmetric, and her other reflexes were normal.  Further, a head CT scan showed no evidence of acute intracranial process, while the attending physician noted that Plaintiff displayed no unusual anxiety or evidence of depression.  It was also noted that although Plaintiff stated that she could not move her left arm, she then used it to grab at a flu swab, and that even though she claimed she was unable to walk, she was ambulatory on arrival and walked to and from a wheelchair.  Stroke and cardiac origins of Plaintiff's alleged paresthesia were ruled out.  Plaintiff was diagnosed with paresthesia and neuropathies, Valium was prescribed, and she was instructed to follow up with a neurologist.  (R.pp. 491-493).

In a March 8, 2013 CMHC progress report it was noted that Plaintiff reported bizarre behaviors, panic attacks, depression, chronic pain, and problems with memory over the previous three months.  Although Plaintiff had been medically cleared with CT scans and MRIs, she continued to complain of medical issues.  The clinician discussed the possibility that Plaintiff had a conversion disorder because her medical problems appeared to be psychiatric rather than actually medically based.  It was noted that the clinician had been working with Plaintiff on a variety of coping mechanisms, and her GAF was rated at 58.  (R.p. 471).

Finally, five months after the ALJ's decision, Plaintiff submitted to the Appeals Council a questionnaire dated December 10, 2013 completed by Dr. Scott Christie of CMHC.  Dr. Christie wrote that he had been treating Plaintiff since March 13, 2012 for MDD, and that Plaintiff's symptoms included anhedonia, sleep disturbance, decreased energy, and difficulty concentrating or thinking.  Dr. Christie opined that Plaintiff displayed a number of symptoms of an affective disorder, but did not have any marked restrictions in her activities of daily living, maintaining social



functioning, or in maintaining concentration, persistence, or pace. However, Dr. Christie also checked boxes indicating that Plaintiff had repeated episodes of decompensation, each of extended duration, or that she suffered from a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands would be predicted to cause her to decompensate. (R.pp. 503-505).

## I.

### (Combination of Impairments)

Plaintiff initially alleges that the ALJ failed to evaluate her impairments in combination. See Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989)[Holding that disability may result from a number of impairments which, taken separately, might not be disabling, but whose combined effect, taken together, is sufficient to render a claimant unable to engage in substantial activity]. Specifically, she claims that the ALJ failed to acknowledge that she demonstrated symptoms of listing-level severity as to her knee, depression, and anxiety. This claim is without merit.

A review of the decision shows that the ALJ properly considered the combined effect of Plaintiff's severe and non-severe impairments in finding that she did not meet or equal a Listing[8] and in determining her RFC. At step three, the ALJ found that Plaintiff did not have an impairment *or combination* of impairments that met or equaled one of the listed impairments. (R.p. 18). In making this finding, the ALJ specifically considered whether Plaintiff's back problems met Listing 1.04 (disorders of the spine), her knee problems met Listing 1.02A (major dysfunction of a joint), and

---

[8]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medial signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). A claimant is presumed to be disabled if their impairment meets the criteria of an impairment set forth in the Listings. See 20 C.F.R. §§ 416.925, 416.926 (2003).



whether her mental impairments (singly or in combination) met or equaled 12.04 (affective disorders) or 12.06 (anxiety related disorders). (R.pp. 18-19). Additionally, the ALJ specifically wrote that she had "considered the combined effects of [Plaintiff's] impairments and [] determined that the findings related to them are not at least equal in severity to those described in Listings 1.02, 1.04, or 12.00." (R.p. 20). Plaintiff has failed to show (other than to conclusarily allege) that she did not do so. See Flaherty v. Astrue, 515 F.3d 1067, 1071 (10th Cir. 2007)[ALJ should be taken at this word when he states that he considered all of the claimant's impairments in combination]. Further, and contrary to Plaintiff's argument that the ALJ failed to fully consider the effect of her obesity on her other impairments, the ALJ specifically addressed Plaintiff's obesity in accordance with SSR 02-1p and its effect on her ability to perform work activity, finding that it had not had a negative effect on Plaintiff's ability to perform routine movement beyond the RFC capacity found by the ALJ. (R.pp. 18-19). The ALJ also then later again noted that she had carefully considered the entire record, and she discussed Plaintiff's severe and non-severe impairments in her RFC analysis. (R.pp. 20-23). Wright v. Astrue, No. 2:10-2449-DCN-BHH, 2011 WL 5403104, at *7-8 (D.S.C. Oct. 18, 2011)[affirming ALJ's decision where he stated he considered the claimant's combination of impairments and discussed each impairment at some point in the decision, and where he did not offer any reason to conclude that further consideration would have produced a different result], adopted, 2011 WL 5403070 (D.S.C. Nov. 8, 2011); Miller v. Astrue, No. 08-62, 2009 WL 2762350 at * * 13-14 (E.D.Mo. Aug. 28, 2009)["Where an ALJ separately discusses the claimant's impairments and complaints of pain, as well as her level of activity, it cannot be reasonably said that the ALJ failed to consider the claimant's impairments in combination"].



Plaintiff appears to argue that the ALJ failed to properly consider her knee impairment because the ALJ did not mention x-ray findings (showing osteoarthritis and a possible osteophyte or loose body in the central joint space) or Dr. Kolehma's notation of limited knee range of motion in determining that Plaintiff did not meet or equal Listing 1.02A.  However, there is no requirement that the ALJ discuss *every* medical record submitted.  Dryer v. Barnhart, 395 F.3d 1206, 1211(11th Cir. 2005) [ALJ not required to specifically refer to every piece of evidence in the decision].  Rather, what is required is that the ALJ review the medical records and set forth a rationale for her decision that is supported by substantial evidence in the case record.  Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) ["What we require is that the ALJ sufficiently articulate her assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"]; Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985) [ALJ's discussion of evidence need only be sufficient to "assure [the court] that [he] considered the important evidence . . . [and to enable the court] to trace the path of [his] reasoning"].  An ALJ is not required to provide a written evaluation of every piece of evidence, but need only "minimally articulate" her reasoning so as to "make a bridge" between the evidence and her conclusions.  Fischer v. Barnhart, 129 F. App'x. 297, 303 (7th Cir. 2005) (citing Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004)); Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ["ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered"] (citations omitted).  The ALJ met this standard in her decision.  The ALJ specifically discussed Plaintiff's knee impairment and properly found that it did not meet or equal Listing 1.02A[9] because

---

[9]This Listing requires:

(continued...)

16



it did not result in an inability to ambulate effectively; (R.p. 18); a conclusion which finds substantial support in Plaintiff's medical records. See (R.pp. 346-347, 389-392, 491-493). Even Dr. Kolehma, in her report of December 6, 2011, noted that Plaintiff was able to ambulate without assistance. (R.p. 365). Additionally, the ALJ further discussed the knee x-ray evidence as well Dr. Kolehma's examination later in her decision. (See R.p. 22).

As for the opinion of Dr. Christie submitted to the Appeals Counsel as part of Plaintiff's appeal of the ALJ's decision, Plaintiff concedes in her brief that Dr. Christie's opinion does not warrant remand by itself, but argues that this Court must review the record as a whole in reaching a decision in this case, including this new evidence. Plaintiff's Brief, ECF No. 14 at 11. However, the undersigned is constrained to point out that the Appeals Council itself undertook such a review of this evidence, as upon the submission of evidence that is "new and material," the Appeals Council "evaluate[s] the entire record including the new and material evidence submitted [and] then review[s] the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. 404.970(b); see also Meyer v. Astrue, 662 F.3d 700,

---

[9](...continued)
Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. Pt. 404, Subpt. P.App. 1, § 1.02A.



707 (4th Cir. 2011). Here, the Appeals Council considered this additional evidence (consisting of the medical source statement from Dr. Christie dated December 10, 2013) and wrote:

> [w]e considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of evidence of record [and] found that this information does not provide a basis for changing the Administrative Law Judge's decision."

(R.pp. 2).

The undersigned can find no reversible error in the Appeals Council's treatment of this evidence. In <u>Meyer</u>, the Fourth Circuit rejected the Plaintiff/Appellant's argument that Appeals Councils are required to articulate a rationale for denying a request for review, finding that the Appeals Council is required to make findings of fact and explain its reasoning only where it *grants* a request for review and issues its own decision on the merits. <u>Meyer</u>, 662 F.3d at 706. Conversely, when the Appeals Council receives additional evidence and *denies* review, a was the case here, the issue for the reviewing court is whether the ALJ's decision is supported by substantial evidence or whether a remand is necessary for the ALJ to consider the new evidence. As was found by the Appeals Council, the new evidence submitted by Plaintiff from Dr. Christie does not negate the substantial evidence supporting the ALJ's decision in this case.

Plaintiff may be attempting to argue that, with Dr. Christie's opinion, she can show that she met or equaled part A of Listings 12.04 and/or 12.06. However, this is not a viable argument for reversal because even if Plaintiff could show that she met or equaled part A of these Listings, she has still made no showing that she meets part B of these Listings, which both require a showing of at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or



3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt. P.App. 1, §§ 12.04(B), 12.06(B).  Dr. Christie himself specifically wrote "N/A" next to the question of whether Plaintiff suffers from any of these factors.  (R.p. 504).

Plaintiff may also be arguing that she meets or equals the Listing at 12.04(C)[10] based on Dr. Christie's opinion that Plaintiff had repeated episodes of decompensation[11] and a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Plaintiff to decompensate.

---

[10]This Listing requires:

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P.App. 1, § 12.04(C).

A claimant may meet or equal Listing 12.06 if satisfies both A and C of that Listing.  Plaintiff has made no showing that she met or equaled 12.06 (C) which requires that the anxiety disorder result "in complete inability to function independently outside the area of one's home."  20 C.F.R. Pt. 404, Subpt. P.App. 1, § 12.06(C).

[11]Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning." 20 C.F.R. Pt. 404, Subpt. P, App.1,. § 12.00(C)(4). "Repeated episodes of decompensation, each of extended duration" is defined as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  Id.



However, there is no indication in Dr. Christie's opinion that Plaintiff (who Dr. Christie had treated for less than two years at the time of his opinion) had a "medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" with the decompensation.  Additionally, the opinion fails to identify when these purported episodes of decompensation and/or predicted decompensation began.

Finally, the medical records from CMHC, where Dr. Christie practiced, as well as Plaintiff's other medical records, simply fail to note any such episodes of decompensation or any notation of a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."[12]  As noted by the ALJ in her decision, Plaintiff has not required repeated emergency treatment or inpatient hospitalization for her depression/anxiety, Plaintiff acknowledged (in April 2012) that a medication change helped her after starting treatment at CMHC, while her conservative course of treatment was inconsistent with a level of severity that would preclude work activity.  (R.p. 21).  See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992)[generally conservative treatment not consistent with allegations of disability].  Plaintiff's GAF scores also consistently reflected only mild to, at most (on occasion), moderate symptoms being present.  Further, Plaintiff's testimony and reports of her activities of daily living indicate that her

---

[12] "Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)."  20 C.F.R. Pt. 404, Subpt. P, App.1,. § 12.00(C)(4).  Episodes of decompensation may be inferred from "medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode."  Id.



limitations were mainly caused by her physical impairments (which the ALJ took into account by

limiting Plaintiff to a reduced range of sedentary work) rather than her mental impairments. (See

R.pp. 22, 210-211, 357, 365). No reversible error has been shown with regard to the ALJ's analysis

of this evidence in her decision, and nothing in Dr. Christie's opinion changes any of this evidence.

   In sum, Plaintiff has failed to establish any error in the ALJ's review and consideration

of the effects of her medical problems on her ability to work, including the effect of the combination

of those impairments. Martise v. Astrue, No 08-1380, 2010 WL 889826 at * 23 (E.D. Mo. Mar. 8,

2010)[ALJ sufficiently considered Plaintiff's impairments in combination by summarizing Plaintiff's

medical records and separately discussing each of Plaintiff's alleged impairments] (citing Hajek v.

Shalala, 30 F.3d 89, 92 (8th Cir. 1994)[conclusory statement that ALJ did not consider combined

effects of impairments was unfounded where ALJ noted each impairment and found that

impairments, alone or combined, were not of listing-level severity]; see also Browning v. Sullivan,

958 F.2d 817, 821 (8th Cir. 1992)[Finding that separate discussion of all of a plaintiff's impairments

with the conclusion that these impairments did not prevent the plaintiff from performing her past

relevant work was sufficient to establish that the ALJ did not consider Plaintiff's impairments were

disabling in combination, and that to "require a more elaborate articulation of the ALJ's thought

processes would not be reasonable"]; Waxvik v. Apfel, No. 99-152, 2001 WL 1820373, at * 4

(D.N.D. Mar. 12, 2001); Isaacs v. Shalala, No. 92-4101, 1994 WL 247276, at * 5 (N.D. Iowa Mar.

11, 1994) Wilfong v. Shalala, No. 93-472, 1994 WL 780186, at * 4 (D.Minn. Oct. 18, 1994); see

also Williams v. Colvin, No. 11-2344, 2013 WL 877128, at *3 (D.S.C. Mar. 8, 2013); Simmons v.

Astrue, No. 11-2729, 2013 WL 530471, at * 5, n. 7 (D.S.C. Feb. 11, 2013)["When considering

whether the ALJ properly considered the combined effects of impairments, the decision must be read



as a whole"]; <u>Glockner v. Astrue</u>, No. 11-955, 2012 WL 4092618, at * 4 (D.S.C. Sept. 17, 2012). This argument is therefore without merit.

## II.

### (RFC)

Plaintiff also argues that the ALJ erred because the RFC finding was legally and factually insufficient. Plaintiff contends that she introduced evidence of back pain; knee pain with limited use of her knee; occasional ankle swelling; and mental impairments that led to fatigue, impaired concentration, and irritability, but that the ALJ failed to address whether she could perform the individual functions called into question by these symptoms. Plaintiff also argues that the ALJ failed to address whether she could sustain functioning at the level indicated on a regular and continuing basis and failed to explain whether her symptoms would inhibit her ability to meet the production demands of the proffered jobs. However, a careful review of the ALJ's analysis and findings fails to substantiate Plaintiff's claim of an improper RFC analysis.

RFC is defined as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). In SSR 96-8p, RFC is defined as a function-by-function assessment of an individual's physical and mental capacities to do sustained, work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours per day, five days per week, or the equivalent. SSR 96-8p, 1996 WL 374184. An RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations);" <u>Id.</u> at *7; and "[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies



in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir.2015), citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013).

Here, the ALJ set forth a narrative discussion of the medical and nonmedical evidence which led her to conclude that Plaintiff had the RFC to perform the range of sedentary work noted in the decision, specifically addressing each of Plaintiff's impairments. (R.pp. 20-23). In doing so, the ALJ noted (R.p. 23) that none of Plaintiff's treating or evaluating physicians had offered any medical opinion regarding Plaintiff's functional limitations; see Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)[finding that no physician opined that claimant was totally and permanently disabled supported a finding of no disability]; while further giving considerable weight to the medical opinions of the state agency medical consultants (R.p. 23). Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) [Opinion of non-examining physicians can constitute substantial evidence to support the decision of the Commissioner]. Indeed, it is readily apparent that the ALJ gave Plaintiff every benefit of the doubt as to some of her subjective complaints by including limitations in Plaintiff's RFC that were even greater than those opined to by the state agency medical consultants (R.p. 23). See Marquez v. Astrue, No. 08-206, 2009 WL 3063106 at * 4 (C.D.Cal. Sept. 21, 2006)[No error where ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State Agency examiner]; see also Siler v. Colvin, No. 11-303, 2014 WL 4160009 at * 5 (M.D.NC. Aug. 19, 2014) [Same]; cf. Muir v. Astrue, No. 07-727, 2009 WL 799459, at * 6 (M.D.Fla. Mar. 24, 2009)[No error where ALJ gave Plaintiff even a more restrictive RFC than the medical records provided].

Plaintiff, citing Mascio, argues that the ALJ erred as to the mental RFC findings, arguing that the ALJ failed to explain why her symptoms would not inhibit her ability to meet the



production demands of the jobs identified, and as to the consistent pace and attendance required by "any job." <u>See</u> <u>Mascio v. Colvin</u>, 780 F.3d at 638 ["[A]n ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'"] (quoting <u>Winschel v. Comm'r of Soc. Sec.</u>, 631 F.3d 1176, 1180 (11th Cir. 2011)). However, unlike the decision in <u>Mascio</u>, the ALJ's RFC determination in this case, as well as the hypothetical question she presented to the VE, adequately accounted for Plaintiff's work-related functional limitations from her mental impairments.

In <u>Mascio</u>, the Court noted that despite the ALJ's conclusion at step three that the claimant had moderate difficulties in concentration, persistence, or pace as a side effect of her pain medication, the ALJ's RFC finding did not contain any limitations regarding Mascio's mental functioning except a notation that Mascio was limited to "unskilled work." <u>Mascio</u>, 780 F.3d at 638. Although the Court noted that the ALJ could find that a concentration, persistence, or pace limitation did not affect Mascio's ability to work, the ALJ did not make that finding in the decision, requiring a remand. <u>Id.</u> In the RFC discussion in the present case, however, in determining the effect Plaintiff's mental impairment had on her RFC for work, the ALJ specifically noted that although Plaintiff reported difficulty with her memory and confusion, her GAF scores generally reflected only moderate to mild psychological symptoms while her medications were generally helpful with no reported side effects. (R.p. 21). The ALJ also noted Plaintiff's uneven treatment compliance as well as her credibility shortcomings as noted by her physicians in concluding that she had portrayed her limitations as being significantly more severe than was supported by the objective evidence. (R.p. 22). <u>See</u> <u>Anderson v. Barnhart</u>, 344 F.3d 809, 815 (8th Cir. 2003) [Evidence that a claimant is

24



exaggerating symptoms can be considered as part of the evaluation of Plaintiff's subjective complaints].

       The ALJ also noted that while Dr. Bennice found a moderate impairment in Plaintiff's memory/concentration, that Plaintiff's regular activities included preparing simple meals, doing laundry, and driving, which were activities consistent with the ability to perform simple, routine, repetitive tasks.  (R.pp. 19, 22, 210-211, 358).  See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005)[Accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she engaged in a variety of activities]; see generally Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) [ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints].  Notably, the Winschel[13] case, on which Mascio relies, recognized that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations."  Winschel, 631 F.3d at 1180 (citing Simila v. Astrue, 573 F.3d 503, 521–22 (7th Cir.2009); Stubbs–Danielson v. Astrue, 539 F.3d 1169, 1173–76 (9th Cir. 2008); Howard v. Massanari, 255 F.3d 577, 582 (8th Cir.2001)).  Further, the ALJ in this case also specifically stated that in determining the effect Plaintiff's mental impairment had on her RFC, she had "considered [Plaintiff's] depression/anxiety and complaints of difficulty with her memory and concentration and difficulty interacting with others in limiting her to simple, repetitive tasks with only occasional interaction with the general public."

---

      [13]Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176 (11th Cir. 2011).



(R.p. 23).  Finally, as noted above, the ALJ's mental RFC findings are also supported by the findings of the state agency psychologists (which the ALJ gave considerable weight).

These findings support the ALJ's determination that Plaintiff could perform the production demands of the jobs identified in the decision.  While Plaintiff obviously believes she should have been assigned greater limitations, it is the job of the ALJ to evaluate the record and make findings after a review of the evidence, which is what the ALJ did in this case.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence].  The ALJ made specific findings with respect to Plaintiff's RFC and addressed what evidence those findings were based on and why.  Plaintiff simply disagrees with the conclusions reached by the ALJ; however, her argument that the ALJ was required to have gone into even greater detail with respect to her findings is without merit.  Dryer v. Barnhart, 395 F.3d at 1211 [ALJ not required to specifically refer to every piece of evidence in the decision]; Rogers v. Barnhart, 204 F.Supp.2d 885, 889 (W.D.N.C.2002).  Even assuming for purposes of further discussion that a different conclusion *could have* been reached based on the evidence prevented, that is not a basis on which to overturn the decision.  Kellough v. Heckler, 785 F.2d 1147, 1149 (4th Cir. 1986)["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)]; Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D. Ohio Nov. 15, 2011)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."], adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012).



There is nothing in the record cited and discussed hereinabove which would warrant this Court overturning the ALJ's RFC decision in this case, and this claim of error is therefore without merit. <u>Hays</u>, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; <u>Smith v. Chater</u>, 99 F.3d 635, 638 (4th Cir. 1996)["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]; <u>Poling v. Halter</u>, No. 00-40, 2001 WL 34630642, at * 7 (N.D.W.Va. Mar. 29, 2001)["It is the duty of the ALJ, rather than the reviewing court, to assess the evidence of record and draw inferences therefrom"].

### Conclusion

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir.1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. <u>Blalock</u>, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be affirmed.



The parties are referred to the notice page attached hereto.

_____

Bristow Marchant
United States Magistrate Judge

October 8, 2015
Charleston, South Carolina



### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

